Filed 10/8/24  P. v. Martin CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MARK MCDONALD MARTIN,<br><br>Defendant and Appellant. | F086531<br><br>(Super. Ct. No. VCF408897)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Nathan G. Leedy, Judge.

Deborah L. Hawkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Jessica C. Leal, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

After casing the property, appellant Mark McDonald Martin slipped into the attached garage of the home where his restraining order–protected former girlfriend, their two toddler daughters, and her current boyfriend were present.  All four were watching

the waning portions of the 2021 Super Bowl at the time, although the little girls had fallen asleep on a mattress on the living room floor. Martin threw gasoline he had brought with him onto the garage floor, ignited it, and then fled, causing a fire that quickly spread and soon threatened the entire residence. Fortunately, everyone inside was able to safely escape the flames without injury, and the fire department arrived and controlled the blaze.

A jury convicted Martin of four counts of willful, deliberate, and premeditated attempted murder (Pen. Code,[1] §§ 664 & 187, subd. (a)), arson of an inhabited structure (§ 451, subd. (b)), and first degree burglary of an inhabited dwelling (§§ 459 & 460, subd. (a)). The trial court sentenced Martin to four consecutive indeterminate terms of seven years to life on the attempted murders, along with determinate terms for the arson and burglary convictions which were stayed pursuant to section 654.[2]

Martin raises two claims on appeal:

(1) There was insufficient evidence to support the attempted murder and arson convictions, both as to the identity of the perpetrator and whether the fire was deliberately set or merely accidental.

(2) The trial court prejudicially erred in its response to the jury's request for clarification on the intent element of the attempted murder charges "because the response failed to inform the jurors that they must determine whether [Martin] possessed the intent to kill for each alleged victim." (Bold font and capitalizations omitted.)

We affirm.

---

`     [1] All undesignated statutory references are to the Penal Code.

[2] Both parties state that the sentences on the four attempted murder counts were to run concurrently, but the record shows they were imposed consecutively. In any event, Martin does not challenge his sentence, and the record speaks for itself.

2.

## DISCUSSION

## I. SUFFICIENCY OF THE EVIDENCE

Martin contends that the evidence was insufficient to sustain the jury's attempted murder and arson verdicts.[3] He focuses on two elements common to both convictions: Was the evidence sufficient to show that the fire was deliberately set, not an accident, and that Martin was the person who set it? It was both.

### A. The Facts

Because Martin raises a sufficiency of the evidence claim, we lay out the underlying facts in some detail, doing so as we must in the light most favorable to the judgment. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts relevant to the jury instruction issue Martin also raises are separately set forth below.

#### i. The Backdrop

Martin and S.M. started dating in February 2018 and rather quickly had two daughters, M.M.1 and M.M.2.[4] The couple separated soon after M.M.2 was born in March 2020 because S.M. said she "had to put a stop to" Martin's repeatedly stealing from her. By February 7, 2021, the date of the current offenses, M.M.2 was "about to turn a year [old], and [M.M.1] would have been just two." In the meantime, S.M. had obtained custody of the girls and Martin had no visitation rights.

After they separated, Martin continued to contact S.M. almost daily to tell her he missed her, loved her, and wanted to see her. She would try to block his calls, but he would just get new phone numbers and call her again. He would leave voicemails "crying and then cussing and then more crying," telling her he loved her, but also at times

---

[3] Martin does not challenge the burglary conviction.

[4] Because the girls are crime victims, and minors, we must protect their identities as much as possible. (See Cal. Rules of Court, rule 8.90(b)(4).) Both girls share the same initials, so we will use a simple numerical appellation in our references to them. We mean no disrespect by doing so.

that he hated her.  These attempts continued up to and until he was arrested for the current offenses in February 2021.

In one particularly telling voicemail, Martin told her: " 'Fucking burn to death. Fucking slow, horrible in a fucking car accident.' "  He continued, " 'You don't even need to file for custody.  You fucking keep them….  I don't want nothing to do with you, whatsoever.  Nothing with your daughters …. Change their fucking last name …. For reals change their fucking last name.' "  He added, " 'I wanna get off their fucking, the birth certificate too.  I don't want to be on the birth certificate at all.' "  In another voicemail, he said, " 'I hope you fucking die you fucking fat fucking cow.  Fucking fat bitch.  I hope you fucking die.' "  S.M. testified that Martin had also sent her several similar text messages.[5]

In "the middle of 2020," S.M. began dating A.C., and the two began intermittently living together thereafter.  By February 2021 they were still together, with S.M. and the girls now spending only a small part of their time at her parents' home and "slowly moving" fulltime into A.C.'s house.[6]

In December 2020,  S.M. and A.C. had a party for M.M.1's second birthday at S.M.'s parents' house.  The event was posted on social media where their relationship was publicly disclosed for the first time.  The event was also noteworthy because when leaving the party S.M. found a handwritten note on her car that said " '[A.C.], leave

---

[5] S.M. also said she had obtained a restraining order, but that Martin repeatedly violated it, both by showing up down the street from where she lived and by his continuing attempts to communicate with her.

[6] A.C.'s house was actually owned by his father, P.C., who testified the garage was well–maintained in February 2021, there were no gasoline containers inside because the yard equipment was all battery–powered, and there was nothing like "newspapers or anything … piled up" near the water heater that could have accidentally caught on fire.

now,' " or something similarly threatening.[7] In addition, the note contained a small addendum, "#SM", which S.M. testified was something A.C. had used on his social media to describe her before he and she went public with their relationship in order to "[p]ut me in [his] post … without putting me in the post." S.M. said she "absolutely" recognized the handwriting on the note left on her car as being Martin's.

A few weeks later, in a Facebook entry dated January 23, 2021, Martin posted a photo captioned: " 'My plans for Valentine's Day.' " It showed a person sitting in a lawn chair squirting a hose at two people riding by on a passing motorcycle. Written above the two persons was " '*couple' " and above the seated individual was " '*me' ". At the top of the photo, Martin had written, " 'But with a flamethrower instead!!' "

*ii. The Fire*

About two weeks after Martin's "flamethrower" post, on February 7, 2021, at around 6:00 p.m., S.M. and A.C. were watching the Super Bowl in the living room of A.C.'s house with the two girls, both of whom had fallen asleep on a mattress in the middle of the living room floor in front of the television. The living room was fully visible from the outside through sliding glass doors that led into the backyard. S.M. and A.C. left the girls sleeping in the living room and went to the bedroom to continue watching the game without disturbing them.

At some point, S.M. and A.C. both heard a noise sounding like a thud or a hard knock, and as S.M. went into the living room to check on the girls, she heard another thudding sound. She then saw smoke coming into the house through the edges of the laundry/washroom door leading into the garage, and she called for A.C. He opened the door to the garage and yelled, " '[T]here's a fire, call 9–1–1.' " The flames in the garage

---

[7] A.C. testified that he interpreted the note as saying, "I needed to leave, and it was my last chance or last warning."

at that point were already extending to the garage ceiling.  S.M. picked up the girls, ran outside, and called 911.

The Visalia Fire Department responded to the scene and successfully extinguished the fire before the entire house was completely involved.  Initially, the on–scene Fire Captain and an Engineer/Arson Investigator Trainee did not notice anything obviously suspicious about the fire, such as the presence of an incendiary device like a Molotov cocktail or any signs of forcible entry to the garage.  They thought that while the cause of *ignition* of the fire itself was "undetermined," the fire appeared to have been "accidental due to the hot water heater."

### iii.  Martin Returns to Social Media

Later that same night, S.M. and A.C. both received several text messages from friends that included a screenshot of a "poem" that Martin had posted that night on Snapchat:

> "Has the terror sunk in yet, are you not scared now?  Think this is a joke, a punk kid I am not, sit here I plan and plot, it may take some time but patience is what I got, next time it'll be you in that fiery plot, it's real shit in what I wrote. [¶] You chose not to listen and that's your fault, take heed to my first note, has the terror sunk in yet, are you not scared now, think this is a fucken joke?!?!"[8]

S.M. interpreted Martin's reference to the "first note" as the note Martin had left for A.C. on her car in December.

That same night, Martin also left two comments on the Facebook page of the "VISALIA Stringer," who had reported on–line about the fire at 8:19 p.m.  The "VISALIA Stringer" apparently was "a guy that goes around, and … takes videos and stuff of crimes that happen."  He had posted in response to other Facebook inquiries as to

---

[8] The username at the top of this crude doggerel was "TripBitch!!!!"  S.M. explained that Martin's username on his social media accounts was usually " 'Trip Bitch,' " including on his Snapchats.  Martin's bicycle, seized later by police, had the word "trip" painted in red on it.

the fire's cause by saying it "looks like it was the water heater." Using his own name this time, Martin replied, "but how?", followed by, "How the heck does a water heater cause this much damage?"

*iv. Andrew Brown*

The day after the fire, Martin's long–time friend and acquaintance Andrew Brown called the fire department about the fire. Two Visalia police detectives arranged to meet with Brown later that day.

Brown first told the detectives that he had grown up with Martin and knew him "real good." However, he said that "lately [Martin had] been going off a lot … [l]ike real bad on drugs and stuff." He added that Martin had been "going all nuts over" S.M. and was "just psycho over her … [a]nd so that's been a long time going" to the point where he thought Martin must be already well known to police. The detectives acknowledged they knew of Martin quite well.

Brown said that on the day of the fire, at just about dark, he was at Jared Wiley's house with some other friends when Martin arrived riding a bike. Brown was not exact on times, but he did recall hearing sirens around the same time.

Martin told Brown he had gone "in the garage and threw gasoline on the … hot, the water thing, the hot furnace thing." Brown said Martin had then smiled and said, "I lit, um, [S.M.'s] house on fire." Brown added that Martin "was not shy about it, about telling" him what he had done. Martin told Brown that if he did not believe him, to go "check[] what's happening." Martin then smiled again at Brown, got back on his bike, and pedaled away.

Brown and the others in the house checked the news and realized that a house fire had just occurred in the area. Martin had not said whether he knew if anyone was home at the time, but one of the other people at Jared Wiley's house said that he had known something about a Super Bowl get–together at A.C.'s house. Brown said he believed that if this person knew about it, he must have learned it from Martin.

Brown insisted he knew "for a fact" that Martin had started the fire and that, when he heard on the news that the family at the house initially thought the fire was an

accident, he was surprised S.M. "wouldn't know that it was [Martin]," considering how often he had threatened her. Brown told the detectives he "wasn't just gonna be cool with" the fact that Martin had started a fire when Martin's "family's in the house and you know, his own kids in the way." Brown finished by telling the detectives that "it wasn't easy for me" to come forward, but he believed Martin needed help.[9]

### v. The Arson Investigation

Before interviewing Brown, the two detectives had met up with the city's Fire Marshal. He told them that after examining "the immediate vicinity of the water heater," which was the area where he believed the fire had originated, he found indications of certain hydrocarbons around the base of the water heater and on the wood platform the water heater rested upon. These hydrocarbons pointed to the presence of a flammable or combustible liquid. Although such hydrocarbons could, in theory, have spread to the area from the two cars that were parked in the garage at the time of the fire, the Fire Marshal believed that had not been the case. During this initial investigation immediately after the fire, a criminalist had also analyzed a partially burned cardboard box found in the garage, and had detected the presence of gasoline.

About a month later, Stephen Healy, an arson investigator from P.C.'s home insurance company, determined that the fire had actually started on the garage floor and

---

[9] At trial, Brown recanted and either denied or did not remember the statements he had made to the detectives; in fact, he was eventually held in contempt for refusing to testify. He also tried to claim he was on drugs when he talked to the detectives, but one of the detectives — who was deemed an expert in "under the influence of methamphetamine and heroin" — testified that nothing led him to believe that Brown was impaired or under the influence of any type of drugs at the time.

The other detective present during the interview testified she had subsequently spoken to Brown and that he had told her that he had been under "hella pressure" ever since he had come forward. He said the mother of Martin's previously sired children had even sent him photos of those children and told him it would be his fault if her children grew up without their father.

then burned upwards.[10]  Healy found no evidence to indicate that the water heater had caused the fire, or that it had exploded.  Instead, he detected an ignitable liquid pour pattern on the floor near the water heater and based on these facts, he determined the fire was intentionally set by using an ignitable liquid like gasoline that had been triggered by an open flame.  Healy further concluded there was no other probable or even possible cause of the fire.  From this new evidence, the Visalia Fire Marshal then revised his earlier tentative opinion and also concluded that "the fire was incendiary in nature which is a change from accidental."  In other words, "[i]t's the equivalent of arson."

### vi. Video Surveillance

Detectives collected surveillance camera video from A.C.'s home, Jared Wiley's house, and from a senior living community near A.C.'s house.  When shown a compilation of these videos, S.M. identified Martin as the person depicted in them all.  She recognized the way he was dressed, his appearance and kind of clothing, his backpack, the bike's handlebars, the way he walked and ran; she said "everything was the same."

The videos showed Martin riding a BMX–style bike towards A.C.'s house at around 6:35 p.m. on February 7, 2021, wearing a hoodie and carrying a backpack.  At 6:37 p.m., Martin could be seen walking across A.C.'s front yard.  At 6:38 p.m., the fire appeared on the videos, and Martin was also shown running back in the direction from which he had come.  At 6:40 p.m., Martin could be seen riding his bike away from the scene.

---

[10] Unlike the "trainee" who was present at the initial fire scene, Healy had been a fireman since 1986 and had 25 years of experience investigating arsons, both as a fire department investigator and a privately retained expert.  He was a Certified Fire Investigator for the State of California, a Certified Fire and Explosion Investigator for the National Association of Fire Investigators, and a Certified Fire Investigator for the International Association of Arson Investigators.  He had an "arson degree in ignitable detection K–9" and was the handler of a trained dog.  Although he said he had lost count, he said he investigated over 380 fires, probably 20 of which were arsons.  The trial court designated Healy an expert in arson investigations with no objection from the defense.

At 7:11 p.m., video taken from Jared Wiley's house showed Martin arriving on a bike and ringing the doorbell. Based on a Google Maps inquiry, a detective estimated it would take 27 to 31 minutes to ride a bike from A.C.'s house to Jared Wiley's house. The video evidence confirmed a 33–minute time difference between Martin's flight from the fire and his arrival at Jared Wiley's house.

*vii. Jared Wiley and Savannah Imoto*

On February 24, 2021, the lead detective talked to Jared Wiley, who was another of Martin's friends from childhood. Wiley told her that Martin showed up at his house on a bike on the night of the fire, confirming the video evidence.

She also spoke to Savannah Imoto, Wiley's girlfriend, who had known Martin since high school. Imoto said she was at Wiley's house when Martin arrived and told her, through the surveillance camera system, to open the garage. She said Martin appeared excited, in a rush, and panicked. Imoto opened the garage door and heard Martin saying something about a webpage. She searched on–line and learned about the fire.

Imoto told the detective that Martin was "just jealous, psycho jealous" over S.M. She also explained she had later learned from Andrew Brown that there had been people inside the burning house. She said that was "[i]nexcusable no matter what…." When the detective told her she had watched other surveillance videos showing Martin lurking around the back of A.C.'s house and that depicted him walking up to the sliding doors through which the sleeping girls were visible, Imoto remarked, "He knew, he knew."[11]

*viii. Martin's Post-Arrest Jail Calls*

Two days after the fire, on February 9, 2021, Martin was arrested while riding his bike, the same BMX bike with the word "trip" painted in red on it as described by S.M.

---

[11] Both Wiley and Imoto later told investigators that they did not want to testify at trial and, when finally put on the witness stand, both denied that Martin had said anything, and insisted they had no memory of the night in question or of what they had earlier told the detectives in their taped interviews. The prosecutor impeached their denials with their previously recorded statements.

During one of at least 12 monitored jail calls, Martin told Stephanie Rodriguez, the mother of his previously sired other two children, to get his bike out of the police evidence locker as soon as possible, which she did after the investigating detective cleverly allowed it. When Rodriguez told Martin in a later jail call that she had picked up the bike, Martin told her, " 'Do me a favor … Get rid of it.' "

In another call, Martin instructed Rodriguez to tell Jared Wiley to tell Andrew Brown not to come to court. During another call, Martin explained that since Brown was the only reason he was still in custody, if Brown did not show up, he would have to be released. In yet another jail call, Martin talked to a friend named "Carlos," in which Martin referred to Brown as " 'snitching on him.' " Carlos responded " 'something to the effect of,' 'Yeah, well, he knows that he's gonna get whacked if he keeps snitching.' "

*ix. Domestic Violence Expert Testimony*

Lastly, the prosecutor called a domestic violence expert witness who testified about the classic cycles of domestic violence, in which the abuser acts as the "perfect textbook" partner until tension builds up and then eventually bursts into the abuser again, terrorizing their partner emotionally or physically. The abuser then apologizes, and the cycle continues; but the more it continues, the more difficult it becomes for the victim to escape from this cycle. The expert further explained that, in domestic abuse cases, when the victim finally removes themself from the cycle of abuse, the abuser will respond by escalating the situation with violent threats that often "will turn into real–life action," even concluding with homicide.

In response to a hypothetical scenario modeled on the facts of this case, the expert opined that the abuser would have realized his prior power and control techniques over his victim no longer worked and therefore he had to escalate the situation into more and more violence. He further opined that the abuser in the presented hypothetical was "lighting the house on fire to kind of symbolize a few things. One, I'll kill your [boyfriend]. One, I'll kill our children. I'll take our children away from you and, … the ultimate, if you don't want to be with me, well, I'll just kill you."

11.

*x. The Defense Case*

There was none.[12]  Martin did not testify, and the defense rested without presenting any evidence.

**B.  Standard of Review**

"In reviewing a sufficiency of the evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.)  " ' "[W]e review the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence — that is, evidence which is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780.)  " '[W]e review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, original italics.)  " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*Ibid.*)

Moreover, " '[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.) " 'The testimony of one witness, if believed, may be sufficient to prove any fact. ' " (*People v. Johnson* (2019) 32 Cal.App.5th 26, 57; see Evid. Code, § 411.)  We "can only

---

[12] Martin characterizes selected snippets of defense counsel's cross–examination of the witnesses in the prosecution's case–in–chief as the "defense case," (bold font and capitalizations omitted), but no affirmative defense "case" was ever proffered or defense evidence introduced.

reject evidence accepted by the trier of fact when the evidence is inherently improbable and impossible of belief." (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268.)

Thus, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)  Simply put, Martin "bears an enormous burden" to prevail on a sufficiency of the evidence claim.  (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)  It is one he has not met here.

### C.  Legal Background

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'  [Citation.]  When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine.  [Citation.]  [¶] Direct evidence of intent to kill is rare, and ordinarily the intent to kill must be inferred from the statements and actions of the defendant and the circumstances surrounding the crime." (*People v. Canizales* (2019) 7 Cal.5th 591, 602 (*Canizales*).)

"Section 451 makes a person 'guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids, counsels, or procures the burning of, any structure, forest land, or property.' … [§ 451, subd. (b)] proscribes '[a]rson that causes an inhabited structure or inhabited property to burn.' " (*People v. Goolsby* (2015) 62 Cal.4th 360, 364.)  "Willfully" means a purpose or willingness to commit the act.  (§ 7, subd. (b)(1).)  As used in section 451, the term "maliciously" "imports a wish to vex, defraud, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law." (§ 450, subd. (e).)

Unlike attempted murder, however, arson is a general intent crime requiring only an "intent to willfully commit the act of setting on fire under such circumstances that the direct, natural, and highly probable consequences would be the burning of the relevant

structure or property." (*People v. Atkins* (2001) 25 Cal.4th 76, 89 (*Atkins*); *People v. Fry* (1993) 19 Cal.App.4th 1334, 1339 (*Fry*).) Thus, arson does not require a specific intent to cause the burning of the entire structure itself. (*Atkins, supra*, 25 Cal.4th at p. 86; see also *People v. Lee* (1994) 28 Cal.App.4th 659, 664; *Fry, supra*, 19 Cal.App.4th at p. 1339; *People v. Glover* (1991) 233 Cal. App. 3d 1476, 1483.) In other words, there is no requirement that a defendant intended to burn down the entire house so long as he intended to commit the act of setting a fire under circumstances that naturally and likely would cause the burning of the house. (*Atkins, supra*, 25 Cal.4th at p. 89; see also *Fry, supra*, 19 Cal.App.4th at p. 1339.)

### D. Analysis

Martin tells us there was insufficient evidence to show that he was the arsonist. In support of this claim, Martin seems to suggest that his identity was shown *solely* by S.M.'s recognition of him in the surveillance videos and then goes on to challenge the validity of her identification.

First, this is incorrect because it omits the entirety of the other evidence pointing to Martin as the perpetrator, including but not limited to his own statements, both before and after the fire on social media, his statements to Brown and the others at Wiley's house, and his post–arrest attempts to conceal or destroy evidence, i.e., his bike.

Secondly, Martin insists S.M.'s testimony as to identity should be disregarded because it was rooted in "confirmation bias," a term commonly found in the jargon of psychologists and other social scientists that is often used to explain how people may tend to process perceptions by looking for, or interpreting, information that is consistent with their pre–existing beliefs. However, there was no evidence adduced at trial regarding "confirmation bias," its meaning, or its potential relevance to this case, and appellate counsel's apparent attempt to now testify to its applicability here as an expert witness is unavailing, if not improper, and we cannot consider it.

As to his next claim. as to whether the fire was accidental or deliberately set, Martin focuses on the initial impressions of the Visalia Fire Department's two initial on–scene personnel, neither of whom was qualified at trial to provide expert arson testimony,

14.

and who in fact only made preliminary comments at the scene of the fire. Martin again ignores the rest of the evidence, especially that derived from the subsequent detailed investigation done by Healy, the only expert witness to testify, who concluded to the contrary. Indeed, the Visalia Fire Marshall also ultimately agreed the fire was an arson and articulated upon what specific evidence he based that conclusion.

Martin also makes his "confirmation bias" argument, but again points to no *evidence* that this buzzword had any probative basis, let alone foundation, in this case other than appellate counsel's unfounded "expert" testimony.

Martin assails the reliability of Brown's testimony as to exactly what Martin had told him when he admitted to setting the fire because it was not precisely consistent with the forensic evidence that was later presented at trial about the water heater. However, this argument goes to Brown's credibility and misses the point for purposes of our substantial evidence review.

In the end, both of Martin's insufficiency claims fundamentally misconstrue the relevant standard of review, and our role as an appellate court, because they essentially ask us to reweigh the evidence. Our review is limited to "whether substantial evidence supports the [jury's] decision, not whether the evidence proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432; see *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319 [the relevant "inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt' "].)

"Confirmation bias" or not, neither S.M.'s credibility — nor that of the initially responding fire department personnel, or even Brown's — are questions for us as a reviewing court to consider. They were for the jury, and do not affect our substantial evidence review on appeal.

It was the jury that assessed the credibility of the witnesses and made the ultimate determinations of whom and what to believe, and to what extent. (Cf. *People v. Dowl* (2013) 57 Cal.4th 1079, 1092 ["To be sure, defendant offered explanations for some of [the] circumstances, but the jurors did not have to believe them."]) Indeed, we are not

15.

free to reform a jury's verdicts simply because the evidence could arguably support contrary findings. (*People v. Jackson* (2016) 1 Cal.5th 269, 345.) "Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490.) Despite Martin's implicit suggestions to the contrary, this was not a close case. The perpetrator's identity and the deliberate nature of the fire are more than adequately supported by substantial evidence.

## II.  THE JURY QUESTIONS

Martin also contends that the trial court prejudicially erred in its response to the two–part question the jury sent out during their deliberations regarding the intent element of the attempted murder counts. We again disagree.

### A.  Additional Factual Background

The jurors were given their final instructions and retired to the jury room to begin deliberations at 2:37 p.m., and then left for the day at 4:15. They returned at 10:13 the next morning and, at 11:00 a.m., they sent out two interrelated questions:

(1) "Would the requirement for [intent] of attempted murder be met regardless of defendant's *knowledge* of who typically inhabits a dwelling/structure?" (Original brackets, italics added.)

(2) "Is intent satisfied by the occupants just being present, OR, does the defendant need prior *knowledge* of the occupants' location to prove intent?" (Original capitalization, italics added.)

Trial counsel were summoned, and a discussion ensued. The court began by saying:

> "I read it over a couple of times and the best I can come up with for them, I
> believe, is that these are questions for them to decide. I don't think I can tell them
> one way or the other. I don't think I can tell them they need to find the specific
> facts or not. I think it's up to them. [¶] . . . [¶] Their questions essentially ask for
> guidance as to the meaning of specific facts. I don't think that would be
> appropriate for me to weigh in on."

The prosecutor ambiguously responded, and the court continued:

> "When I read these two questions together, it looks like they're discussing the question of what was *known* by the person who set the fire in terms of who was there at the time, and they want some guidance as to what that means for the purpose of making a finding regarding *intent*. [¶] Again, I just don't think it would be appropriate for me to tell them you may find the requisite intent under this set of facts but not that set of facts. I think that would invade the province of the jury. [¶] They have to decide what the facts are and what those facts mean for the purposes of the law. I just don't think this is a question of pure law that I can educate them on." (Italics added.)

Defense counsel replied, "Right."

The prosecutor then suggested new instructions on the never–before mentioned notions of "transferred intent" and the "kill zone" theory, but the trial court properly declined to "insert" new legal theories of liability that had not been previously presented to the jury.[13]

> In the end, at 11:37 a.m., the trial court told the jury:

> "I have received the question — two questions from you this morning, folks, and unfortunately, this is a situation where I cannot directly answer these questions for you. [¶] I will refer you to some jury instructions in the hopes that they might help you resolve the questions, but essentially, as I read these questions from you, *you're asking the court to give you some advice as to the meaning of — of certain facts and how those relate to an intent requirement here, and that's something that's not appropriate for the court to do. [¶] The jury's job is to decide what the facts are and then apply the law to those facts. It's not my job to do that last step for you.* [¶] So what I would say is I think it might be helpful for you to take another look at portions of Instruction Number 200…. [N]umber one, you must decide what the facts are. It is up to all of you and you alone to decide what

---

**13** Indeed, "the doctrine of transferred intent does not apply to attempted murder. Defendant's guilt of attempted murder must be judged separately as to each alleged victim." (*People v. Bland* (2002) 28 Cal.4th 313, 331.) Similarly, the evidence here did not even remotely suggest that this was a "kill zone" case, where the similar principle of "concurrent intent" would have allowed a jury to convict on all four counts simply based on the nature of the actions Martin had directed at his primarily intended victim or victims, whomever they may have been. (See *Canizales, supra,* 7 Cal.5th at pp. 602–603.) The People wisely do not attempt to re–float either theory on appeal.

happened based only on the evidence that has been presented to you in this trial. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them. [¶] I'll also refer you back to CALCRIM Number 223 which talks about the definitions of direct and circumstantial evidence. [¶] I'll refer you again to CALCRIM Number 224 which talks about circumstantial evidence in particular as it relates to all elements that the People must prove, including acts, but also intent and mental state. [¶] Then finally, I'll refer you back to the obvious one which is Number 600, the CALCRIM instruction defining the crime of attempted murder. [¶] So that's the best I can do for you folks at this point. I regret not being able to give you much more than that, but I don't think it would be appropriate for me to go beyond that." (Italics added.)

Notably, defense counsel did not object to the trial court's manner and method of answering the jury's questions, nor did he proffer any pinpoint instructions to add to the court's response or as a substitute.

At 11:40 a.m., the jurors returned to resume their deliberations. After a lunch break, at 1:48 p.m. the jury requested a read–back of S.M.'s testimony, which was completed at 2:10. At 3:25, the jurors told the bailiff they had reached verdicts.

Now, even though he did not object or offer any alternatives below, Martin claims the trial court's response to the jury was reversible error.

## B. Legal Background

Section 1138 provides in relevant part that: "After the jury have retired for deliberation, … if they desire to be informed *on any point of law* arising in the case, they must require the [bailiff] to conduct them into court. Upon being brought into court, the information required must be given …." (Italics added.) "Section 1138 imposes on the trial court a mandatory 'duty to clear up any instructional confusion expressed by the jury.' " (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1016 (*Lua*).) Thus," '[w]hen a jury asks a question after retiring for deliberation, "[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on *points of law*." ' " (*Ibid*., italics added; *People v. Smithey* (1999) 20 Cal.4th 936, 985.)

Even so, "[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court

18.

has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard [instructions] are often risky. [Citation.] … But a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury. It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

In general, we "appl[y] the abuse of discretion standard of review to any decision by a trial court to instruct, or not to instruct, in its exercise of its supervision over a deliberating jury." (*People v. Waidla* (2000) 22 Cal.4th 690, 745–746; *People v. Eid* (2010) 187 Cal.App.4th 859, 882 (*Eid*).) Under this standard, we will not disturb a trial court's manner of answering a jury's mid–deliberation questions "except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10.) Simply put, we "review for an abuse of discretion any error under section 1138." (*People v. Kopp* (2019) 38 Cal.App.5th 47, 65 (*Kopp*), rev. granted on other grounds, Nov. 13, 2019, S257844; accord, *People v. Hodges* (2013) 213 Cal.App.4th 531, 539; cf. *Eid, supra,* 187 Cal.App.4th at p. 882 [even when an instruction was *legally* flawed, "[t]he court's failure under section 1138 to adequately answer the jury's question 'is subject to the prejudice standard of *People v. Watson* [citation],' i.e., whether the error resulted in a reasonable probability of a less favorable outcome"].)

**C. Analysis**

*1. Forfeiture*

As noted above, defense counsel replied, "Right," when the trial court indicated the jury's question was not "a question of pure law that [it could] educate" them on. Furthermore, when the court explained what it proposed to do, counsel did not object or

19.

offer any additional instructions, and did not say anything after the trial court responded to the jury's questions or after the verdicts were returned.

The People contend that Martin forfeited any claim that the trial court's response to the jury's questions was inadequate because defense counsel both agreed with the trial court's analysis of the jury's questions *and* did not provide any alternative or additional instructions. Martin replies that the claim was not forfeited, and cites section 1259 in support. The People have the better argument.

By answering, "Right" to the trial court's initial analysis of the jury's questions, "counsel's affirmative agreement with the court's reply to a note from the jury forfeits a claim of error." (*People v. Salazar* (2016) 63 Cal.4th 214, 248 (*Salazar*); contrast *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212 [the invited error doctrine does not apply "when a party, *while making the appropriate objections*, acquiesces in a judicial determination" (emphasis added)].) Here, counsel's unambiguous implicit "endorsement of the court's proposal effectively foreclosed further exploration of possible responses to the jury's question[s]." (*Salazar* at pp. 248–249.)

Significantly, counsel here did not simply sit back in silence and fail to object to the court's decision not to provide additional instructions; he in fact affirmatively acquiesced beforehand. Consequently, any subsequent claim of error on appeal was forfeited. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1352, abrogated on other grounds in *People v. Hardy* (2018) 5 Cal.5th 56, 100; see *People v. Harris* (2008) 43 Cal.4th 1269, 1317 [defendant "waived" the claim by agreeing to the court's handling of the jury question]; see also *People v. Roldan* (2005) 35 Cal.4th 646, 729, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 ["When a trial court decides to respond to a jury's note, counsel's silence waives any objection under section 1138. … 'Approval of the [trial] court's action, even though it might have been a technical violation of [§ 1138], cures any possible error.' "].)

Martin's reliance on section 1259 is misdirected. That section provides in part that an "appellate court may … review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." In other words, "the failure to object to an *instruction* in the trial court waives any claim of error unless the claimed error affected the substantial rights of the defendant, i.e., resulted in a miscarriage of justice, making it reasonably probable the defendant would have obtained a more favorable result in the absence of error." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249, italics added.)

However, the issue here is not whether an instruction was "given, refused or modified," because defense counsel never disputed the instructions that were given, or requested any that were denied, and the trial court's response only referred the jury to its previously given instructions without any modifications. Martin does not argue that any of the jury instructions given in this case misstated the law or were otherwise incorrect, only that they were somehow *inadequate*. Nonetheless, he does not *exactly* specify what the trial court should have instead told the jury in response to their questions, or explain why the instructions that had been given were *legally* insufficient.[14]

In *Kopp, supra,* 38 Cal.App.5th at page 68, the court found that in referring the jury to the correct standard instruction in response to its question about deadly weapons was not an abuse of the trial court's discretion under section 1138's mandate to answer a jury request for information. The court further held that the defendant's substantial rights

---

[14] The "authority" Martin cites in support of his section 1259 argument is inapposite; indeed, none actually involves section 1259 at all. He even admits that the question here "is the court's *response* to the jury's note not whether the jury instructions were 'full and complete.' " (Italics added.) Why Martin then gives us three federal court cases regarding the necessity to instruct on all the elements of an offense — none of which had nothing to do with a jury's question for additional assistance on the factual nuances of an element — along with a citation to a California Supreme Court opinion that instead involved the standard of review, is not explained. His reference to section 1259 is simply misplaced.

were not impacted because the earlier instruction had stated the law correctly and in any event, based on counsel's failure to object, the defendant had forfeited the issue on appeal. (*Ibid.*) So too here.

Martin's appellate claim challenging the trial court's response to the jury's questions in this case was therefore forfeited.

### 2. *The Merits: No Abuse of Discretion*

Forfeiture notwithstanding, Martin's claim of error on this point also fails on the merits. Instructive here is *People v. Gonzalez* (1990) 51 Cal.3d 1179 (*Gonzalez*), superseded by statute on other grounds as recognized in *In re Steele* (2004) 32 Cal.4th 682, 690. In that capital murder case, the trial court had given the standard malice, murder, and manslaughter instructions and, during deliberations, the jury asked the court to clarify the legal definition of malice. "[The trial court] explained that he doubted he could improve on the standard definition contained in the instructions previously read and furnished. He urged the jurors to reread the instructional definition [citation] in the context of the preceding and subsequent instructions regarding the definitions and degrees of murder." (*Gonzalez* at p. 1212.) Just as here, defense counsel "neither objected nor offered his own clarifying instructions." (*Ibid.*)

On appeal, the defendant argued that the trial court's refusal to give additional instructions on the meaning of malice violated section 1138. (*Gonzalez, supra,* 51 Cal.3d at p. 1212.) Our Supreme Court disagreed, stating the trial court "did resolve the jury's questions by advising them to reread the malice and homicide instructions in context." (*Id.* at p. 1213.). "Where … the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] [The trial court] fulfilled that duty, and no error or prejudice appears." (*Ibid.*) Such is also the case here.

Martin does not dispute that the trial court properly instructed the jury with the standard instructions on each of the elements of attempted murder.[15] Instead, he insists these standard instructions were not "full and complete," although he does not ever identify where the standard instructions were incomplete, what instructions should have been given but were not, or explain how he was prejudiced by trial counsel's failure to do so.

Instead, Martin now insists the court should have additionally instructed the jury based on *Canizales, supra,* by telling them that: " 'When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined as to each alleged attempted murder victim . . . .' " (quoting *Canizales*, 7 Cal.5th at p. 602).[16]

First, *Canizales* is distinguishable because its limited holding involved how a jury must be instructed on a kill zone theory in an attempted murder case involving a gang–related shooting. (*Canizales, supra,* 7 Cal.5th at pp. 596–597; see *id.* at p. 602 ["We granted review in light of the conflict in the Courts of Appeal regarding the evidentiary basis for applying, and instructing on, the kill zone theory for establishing the intent to kill element of attempted murder."].) The Supreme Court determined that "there is a reasonable likelihood that the jury understood the kill zone instruction in a legally

[15] "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050, subd. (a); *People v. Ramirez* (2021) 10 Cal.5th 983, 1008, fn. 5.) The CALCRIMs are such instructions. (See *People v. Lucas* (2014) 60 Cal.4th 153, 294, disapproved on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53, fn. 19 [The CALCRIMs "are now endorsed and viewed as superior" to the old CALJIC instructions by the Judicial Council])

[16] Martin's truncated quotation via ellipses conveniently omits the rest of the sentence from the Supreme Court's opinion which, after a semicolon, went on to state that: "an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine." (*Canizales*, at p. 602.) As we noted above, this is not a transferred intent case.

23.

impermissible manner. The court's error in instructing on the factually unsupported kill zone theory in that case, combined with the lack of any clear definition of the theory in the jury instruction and the prosecutor's misleading argument, could reasonably have led the jury to believe that it could find that defendants intended to kill [the victim] based on a legally inaccurate version of the kill zone theory[.]" (*Id.* at p. 614.) *Canizales* is of no assistance in the case before us.

Furthermore, here the prosecution presented evidence showing that Martin could have known that all four victims were present at the time he set the fire: a floor plan of the house, A.C. and S.M.'s descriptions of the unobstructed view from outside the house through the sliding glass doors into the living room, including where the girls were sleeping, and the video evidence of Martin skulking around the house just before the fire. In the end, of course, this was a *factual* question — a question only the jury could resolve — and not a *legal* question affected by section 1138.

Second, it was Martin's responsibility to ask for any additional pinpoint instructions he thought to be further responsive to the jury's questions. (See *People v. Estrada* (1995) 11 Cal.4th 568, 574 [it is the defendant's obligation to request any clarifying or amplifying instruction].) Instead, as discussed above, defense counsel acquiesced in the manner in which the trial responded to the jury's questions instead of asking for additional clarification.

Third, and most importantly, the trial court *had instructed* the jury with CALCRIM No. 3515, telling them: "Each of the counts charged in this case is a *separate* crime. You must consider each count *separately* and return a *separate* verdict for each one." (Italics added.) In other words, for each of the four attempted murder counts, the jury had already been instructed that it must distinctly determine the defendant's individualized intent as to each victim in order to reach their verdicts.[17]

_____

[17] Martin has avoided any mention of CALCRIM No. 3515 in his briefing, or explained why it was insufficient to instruct the jury about the individuality of each of the

Phrased differently, CALCRIM No. 3515 had already supplied the jury with the *legal* answer as to how they were to assess Martin's intent as to those four separate offenses with regard to their individuality, and we presume the jury understood and followed their instructions. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 (*Mickey*); *Francis v. Franklin* (1985) 471 U.S. 307, 324, fn. 9 ["[W]e adhere to the crucial assumption underlying our constitutional system of trial by jury that jurors carefully follow instructions."].) Nothing here suggests they did not do so, and Martin fails to point to anything otherwise.

In addition, during his closing argument the prosecutor explained to the jury that Martin was charged with four separate counts of attempted murder. In addressing the elements of the offense, he stated that the "second element, [that] the defendant intended to kill that person [and] there's *four different people he intended to kill*." (Italics added.) Similarly, the prosecutor specifically argued the point as to each victim — S.M., A.C., M.M.1, and M.M.2 — in his summation of how the evidence showed the intent element had been proven as to each individual. Unlike *Canizales, supra,* 7 Cal.5th 591, the prosecutor said nothing that could lead the jury to misconstrue the individual intent requirements.

Because the defense in this case was identity, not intent, in his closing argument defense counsel did say that "there was no evidence offered that whoever set that fire knew [the house] was occupied,[18] *but that's just a side issue*, ladies and gentlemen. The real issue here is identity, and that has not been established beyond a reasonable doubt." (Italics added.) Nevertheless, in his rebuttal argument the prosecutor returned to the intent element and reiterated to the jury that the evidence "point[ed] to [Martin] as the

_____

attempted murder counts he now complains of, even after the People's reference to that instruction in their response brief.

**18** Which, as discussed above in the sufficiency of evidence discussion, and based on the evidence outlined there, is not supported by the record.

25.

only and the sole person who lit that fire *to try to kill those four individuals*." (Italics added.) Plural.[19]

Thus, CALCRIM No. 3515 had already covered the *legal* point Martin now presses on appeal regarding individualized intent as to each count, and the evidence fully supported the *factual* inferences as to individuality that the jury ultimately drew. Neither counsel nor the trial court did anything to mislead the jury or confuse this *legal* issue.

Section 1138 is therefore not only irrelevant here; it also was not violated.

Despite all this, Martin still insists that the jurors "had a question for the court about the intent element of attempted murder," and that the trial court failed to properly answer it. However, on closer reading it is clear that the jury's questions were more subtle than the simple individualized intent question Martin tries to frame for us on appeal.

In fact, the jury's real focus in their questions was on *knowledge*, not intent. The jury's "intent" questions asked whether Martin had to *know* that all four of his victims were present, or at least *likely* present, in order for his subsequent actions setting the fire would suffice to establish his intent to kill all four of them. Thus, the jury asked a *knowledge* question in two related ways: Was it enough that the prosecution proved that Martin *knew* that all four victims *usually* stayed there, or did he actually have to *know* that all four were indeed *then present* in the house, or even that they were *likely* to have been present, in order to establish the requisite intent and then to be guilty of attempting to kill all four when he set the fire?

The trial court recognized that the questions "look[ed] like [the jury was] discussing the question of what was *known* by the person who set the fire in terms of who was there at the time, and they want[ed] some guidance as to *what that means* for the

---

**19** We further note that the jury verdict forms on the each of the four attempted murder counts were individualized, specifically naming each of the four victims.

26.

purpose of making a finding regarding intent." (Italics added.) Neither party ever expressed a different understanding of the jury's questions, and we too agree.

The jury's real question was whether Martin had to *know*, *believe,* or even *suspect* whether all four victims were present because that would be highly probative evidence to show his underlying intent for setting the fire. In his reply brief Martin candidly admits that the jury's questions really involved his "belief." He concedes that "burning the house satisfied the 'direct but ineffective step' element, but [Martin] could not be convicted of an intent 'to kill that person' unless there was some evidence that [he] *believed* that person to be in the house when he set the fire." (Italics added.)

Assuming but not deciding this is true, this is a question of fact — what did the evidence show Martin *knew* or *believed* at the time he set the fire — not of law. The key is that neither "knowledge" nor "belief" are *elements* of the offense of attempted murder. Instead, depending on the facts of the case, both mental states may provide circumstantial *evidence* of a defendant's intent to kill, which *is* the actual element. This also explains why the trial court reminded the jury about its instructions on direct and circumstantial evidence: they as factfinders had to determine, as a matter of fact, whether Martin knew or believed or suspected that all four victims were present *and then*, from any factual conclusions they drew, to circumstantially infer Martin's specific intent to kill all four of his victims.[20]

In the context of specific intent, direct evidence may take the form of an "admission, [a] confession, [or the defendant's] testimony[.]" (*People v. Woods* (1991)

---

**20** It also suggests why, after the trial court had responded to their questions, the jury then requested readback of S.M.'s testimony. In it, S.M. had described where the girls were sleeping on the mattress she had placed on the living room floor in front of the television, their positions with regard to the sliding glass doors, and the fact there were no blinds or curtains on those doors or "anything blocking the view [of] the living room" through those doors from the outside. The court reporter's readback was completed at 2:10 p.m., and by 3:25 p.m. the jurors had their verdicts.

226 Cal.App.3d 1037, 1052.)  Not surprisingly, such evidence rarely exists, and thus "intent can seldom be proved by direct evidence."  (*In re Jerry M.* (1997) 59 Cal.App.4th 289, 299.)  As a result, " 'such intent must usually be inferred from all of the facts and circumstances disclosed by the evidence….' "  (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)  Such was the case here.

Knowledge and belief are not identical, although it is reasonable to conclude that the former is much stronger and more probative circumstantial evidence of intent than the latter.  Both, however, are still valuably relevant circumstantial evidence from which reasonable inferences regarding a defendant's intent can be drawn by a finder of fact.[21]

Accordingly, as originally framed, Martin's appellate claim regarding the failure of the court to give further legal instructions as to the individuality of Martin's intent as to each separate victim really has nothing to do with what the jury actually wanted to know by its questions in this matter.  Rather, the jury was wondering whether Martin's knowledge (or belief or suspicion) that each of the four victims was *present* — whether at the moment he set the fire, or even merely "usually" — was *necessary* to find an

---

[21] One of the fundamental epistemological questions, is how "knowledge" is different from "true belief"; or even if there is a meaningful distinction, let alone what it means to say a belief is "true."  Like most such questions, however, there is still no satisfactory answer from the philosophers.  In the real world, we cannot resolve the question, but we do at least "believe" that for our purposes here there is a difference between knowledge and belief, if only in terms of the relative *strength* of the inferences that may be drawn from such circumstantial evidence.

Indeed, even a *false* belief can provide probative inferential support to a murderous intent: if Martin had seen all four victims inside while he was casing the property, and believed all four were present when he set the fire but, unbeknownst to him, they had all gone next door for a postgame party minutes before he set the fire.  (See *People v. Chandler* (2014) 60 Cal.4th 508, 517 (*Chandler*), and cases cited ["a person may be convicted of an attempt to commit a crime he never could have completed under the circumstances"]; see also *People v. Pham* (2011) 192 Cal.App.4th 552, 560–561 ["[D]efendant cannot escape liability for his attempt to kill [the victims] just because, contrary to his belief, it turned out his intended victims were not where he thought they were," because " 'factual impossibility is not a defense to a charge of attempt.' " ].)

28.

individualized *intent* to kill each victim.  Legally, they were not, but anything else the trial court may have attempted to say other than referring them back to its previous instructions would have potentially intruded on the jury's exclusive factfinding responsibilities by inadvertently commenting on the relevant facts and interfering with what inferences the jury itself could draw from that evidence.

Thus, when the issue is properly framed, we see that the trial court correctly referred the jury to its previously given instructions on their role as factfinders, and the differences between direct and circumstantial evidence.  It also reminded the jury of CALCRIM No. 600, the attempted murder instruction, which as given to the jury simply provided:

> "The defendant is charged in Counts 1, 2, 3, and 4 with attempted murder, pursuant to Penal Code section 664/187(a).  [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person."

The instruction did not limit *how* the jury should infer the requisite intent to kill, nor did it address such concerns as knowledge, belief, or mere suspicion of the victims' presence; but neither does the offense itself.  Furthermore, as discussed, " 'it is well settled that intent to kill, … the mental state required to convict a defendant of attempted murder, may … be inferred from the defendant's acts and the circumstances of the crime.' "  (*People v. Avila* (2009) 46 Cal.4th 680, 701.)

Like the other inchoate crime of conspiracy, the gravamen of the offense of attempt is, at its core, the defendant's underlying intent.  Attempted murder has only two elements: " 'a specific intent to commit the crime, and a direct but ineffectual act done toward its commission.' "  (*Chandler, supra,* 60 Cal.4th at p. 517, quoting § 21a.)  Similarly, conspiracy only requires an agreement between two or more persons to commit an offense coupled with at least one "overt act" beyond mere preparation.  (See §§ 182 & 184.)

29.

Contrast these two offenses with assault, for example, where a "present ability … to commit a violent injury on the person of another" is an *additional* element of the unsuccessful so-called attempt to complete a battery. (§ 240; see *People v. Chance* (2008) 44 Cal.4th 1164, 1167.) However, no such extra element exists either for attempts or conspiracies.

In *People v. Grant* (1951) 105 Cal.App.2d 347 (*Grant*), for example, the defendant constructed an incendiary bomb with a clock–timed trigger, placed it in a suitcase to be loaded on a flight on which his wife and two children were to be passengers, and bought flight insurance on all three from an airport vending machine kiosk. (*Id.* at pp. 349–352.) The plot was foiled when the bomb prematurely ignited in the plane's luggage compartment while being loaded — and extinguished by the ground crew — before the intended victims had even boarded the plane (the pilot, co–pilot and a "stewardess" were already on board, and they were the charged victims in the other three counts). Moreover, the defendant had even lost his nerve after the suitcase had been checked–in and was being loaded, and told his family not to board and to instead leave the airport and go back to their illegally–parked car still sitting curbside. (*Ibid.*)

The defendant was convicted of six counts of attempted murder and the Court of Appeal affirmed, stating that "[i]t is not necessary that there be a 'present ability' to complete the crime, nor is it necessary that the crime be factually possible." (*Grant, supra,* 105 Cal.App.2d at p. 356.) "[W]here a defendant is charged with an attempt to commit a crime it is immaterial whether the attempted crime is impossible of completion if, as in the present case, completion was *apparently possible to the defendant who was acting with the intent to commit the crime of murder*." (*Id.* at p. 357, italics added.)

Here, the jury asked the trial court how knowledge, belief, or even suspicion, should be assessed in determining Martin's intent, but that "apparent possibility" determination was one only they could make. In the end, "the trial court does not abuse its discretion when it determines the best way to aid the jury is by directing the jury to

reread the applicable jury instructions that 'are themselves full and complete.' " (*Lua, supra*, 10 Cal.App.5th at p. 1017.) When the jury sent out its questions and, after discussions with both counsel and due consideration, an experienced trial court stated: "I just don't think it would be appropriate for me to tell them you may find the requisite intent under this set of facts but not that set of facts. I think that would invade the province of the jury. [¶] They have to decide what the facts are and what those facts mean for the purposes of the law. I just don't think this is a question of pure law that I can educate them on." It then told the jury what they must do, and what the court could not do, because they were the ultimate factfinders and the court could only direct them to apply the facts they found to the law they had been given.

Included in that law, of course, was CALCRIM No. 3515, which gave them the *legal* answer to assist their queries regarding how to evaluate Martin's intent as to the four separate attempted murder offenses with respect to Martin's knowledge, belief, and suspicion as to each count. As noted, we presume the jury understood and followed those instructions. (*Mickey, supra,* 54 Cal.3d at p. 689, fn. 17.)

The trial court's considered and cautious response to the jury's questions here was not an "arbitrary, capricious, or patently absurd" ruling "that resulted in a manifest miscarriage of justice." (*Rodriguez, supra,* 20 Cal.4th at pp. 9–10.) To the contrary, there was no abuse of discretion. (*Kopp, supra*, 38 Cal.App.5th at p. 67 ["The trial court was well within its discretion to refer the jury back to the very instruction[s] that provided a specific answer to the jury's question[s]. No more information was needed or required."].)

Indeed, the trial court here did exactly what the law required in these circumstances. In our view, its thoughtful response to the jury was not only not an abuse of its discretion, it was correct.

## **DISPOSITION**

The judgment is affirmed.


                                                 SNAUFFER, J.

WE CONCUR:


DETJEN, Acting P. J.


SMITH, J.